# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

ROSALIND LAWRENCE,        :

    Plaintiff,        :

                          Case No. 3:08cv00303

 vs.        :

                          District Judge Walter Herbert Rice

MICHAEL J. ASTRUE,        :    Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,        :

    Defendant.        :

---

## REPORT AND RECOMMENDATIONS[1]

---

## I.    INTRODUCTION

Plaintiff Rosalind Lawrence applied with the Social Security Administration for Disability Insurance Benefits (DIB) and Supplemental Security Income asserting that she could no longer work, beginning on June 1, 2002, because she was under a "disability" within the meaning of the Social Security Act.  Plaintiff's applications were denied at all stages of administrative review including, most significantly, by the written decision of ALJ Melvin A. Padilla, who concluded that Plaintiff was not under a "disability" and was therefore not eligible to receive DIB or SSI.  (Tr. 18-33).

There is no dispute in the present case that the Court has jurisdiction to review ALJ Padilla's decision.  *See* 42 U.S.C. §§405(g), 1383(c)(3).

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #9), the Commissioner's Memorandum in Opposition (Doc. #11), Plaintiff's Reply (Doc. #12), the administrative record, and the record as a whole.

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff seeks an Order either reversing the ALJ's decision and awarding benefits or, at a minimum, remanding this case to the Social Security Administration to correct certain errors.

The Commissioner seeks an Order affirming the ALJ's decision.

## II.    FACTUAL BACKGROUND

### A.    <u>Plaintiff and Her Testimony</u>

At the time of the ALJ's decision, Plaintiff was 24 years old and was thus considered to be a "younger person" for social security purposes.  *See* 20 C.F.R. §404.1563(c); 416.963(c).[2]  Plaintiff did not graduate from high school or obtain a Graduate Equivalency Diploma (GED).  During her years in school, she attended a special education program. (Tr. 32, 73-140).

Plaintiff's past work consisted of a job as a cashier in a self-service gas station. (Tr. 163).

Plaintiff's claimed disability derives from her mental health difficulties of a long-standing nature.  *See, e.g.,* Tr. 199-200.  At age 3 she was removed from her biological home for abuse and neglect.  (Tr. 201).  She experienced chronic academic and social difficulties in school.  *See* Tr. 199-202.  Scores on intelligence testing showed her functioning in the borderline range of intelligence.  (Tr. 292, 295).

Plaintiff testified during the ALJ's hearing that she has difficulty with math, reading, and writing skills.  (Tr. 691).  These difficulties caused her a problem with being "short" in her prior cashier job, referring (presumably) to the difference between the amount of cash that should have been, and the amount that actually was, in the cashier drawer at the end of her work day.  *See* Tr. 691.  This was so even though she used a cash

---

[2]   The remaining citations to the Regulations will identify only the pertinent DIB Regulations, with full knowledge of the corresponding SSI Regulations.  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) .

register.  (Tr. 701).  Her employer deducted the missing or "short" funds from her paycheck.  (Tr. 691).  Plaintiff explained that she was able to keep the job because she "knew the person who was over it." *Id*.

In addition to her academic shortcomings, Plaintiff testified that she cannot work because she hears voices a lot and gets frustrated a lot.  (Tr. 691).  She sometimes gets depressed and feels suicidal.  She explained, "One minute I can be up, and then the next minute I can be down...."  (Tr. 692).  She has experienced this all her life. *Id*.

Plaintiff does not visit friends; she is "not a people person." *Id*.  She does not visit her family because they do not get along with her.  (Tr. 693).  Plaintiff is not married but she has a boyfriend.  She has four children.  (Tr. 687-88).  She cooks for her children usually by heating things up. (Tr. 693).  She knows how to sweep and mop.  (Tr. 697).  She does not vacuum, do laundry, or do any cleaning up. *Id*.  She watches television.  (Tr. 698-99).  She does not exercise.  (Tr. 699).  Her hobbies are limited to doing "feet and nails from time to time," referring to manicuring and pedicuring, which she does not charge people for doing.  (Tr. 699).  She does not pay her own bills due to difficulty reading the bills.  She gets help reading bills from friends or from her children's father.  (Tr. 701).  She obtained a driver's license by taking an oral exam.  (Tr. 704).  She drives only short distances and tries not to go places she is unfamiliar with. *Id*.

Plaintiff has help caring for her children.  She testified:

> My two little ones, they go over to their godmother's house.  Like, she watch[es] them for me, I'd say, out of the week they might stay there like three days.

> * * *

> And my newborn, if she's not with me, she's with her godmother....  But like far as my kids being with me, I say from a week's time, they might all be with me for like three days ... and another three days they might be gone.

(Tr. 706).

B.     **Additional Evidence**

Plaintiff was seen at Crisis Care at Good Samaritan Hospital in June 2002 with notes indicating diagnoses of Posttraumatic Stress Disorder and Dysthymia. (Tr. 284). She was 10 weeks pregnant but was placed on Prozac and instructed to obtain follow-up counseling at Daymont. *Id*.

A report from Daymont on July 17, 2002 states that Plaintiff "expressed having a need for outpatient treatment to reduce her mood swings and stress. She related having a need to talk to someone to stay focused. She expressed talking to herself on a frequent basis. Like every other day. 'I suppose I am trying to do too much.' She also reports hearing a different voice other than her own inner voice. She related it is a persistent voice, and it has always been there since she was a child." (Tr. 285). She was diagnosed with Axis I: Bipolar Disorder NOS (not otherwise specified), Posttraumatic Stress Disorder, and Psychotic Disorder NOS; Axis II, Borderline Personality Disorder.[3] (Tr. 286). Plaintiff's then-current GAF[4] was 65, *id*., referring to "[s]ome mild symptoms ... or moderate difficulty in social, occupational, or school functioning ... but generally functioning pretty well...." DSM-IV-TR at p. 34.

In November 2002 Plaintiff underwent a consultative psychological evaluation by Mary Ann Jones, Ph.D., for the Ohio Bureau of Disability Determinations. Dr. Jones diagnosed Axis 1: Schizoaffective Disorder, Posttraumatic Stress Disorder, and Developmental Reading Disorder. (Tr. 293). Dr. Jones assessed Plaintiff's then-current

---

[3] Mental health practitioners use a multiaxial system to assess "different domains of information that may help the clinician plan treatment and predict outcome." Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at p. 27 (DSM-IV-TR). Axis I assesses clinical disorders or other conditions that may be the focus of clinical attention. Axis II assesses personality disorders and mental retardation. *Id*.

[4] Mental health practitioners use the "GAF" (Global Assessment of Functioning) scale to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness. It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation. *See Martin v. Commissioner*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at 32-34.

GAF at 53, referring to "moderate symptoms ... or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at p. 34.

Dr. Jones believed that Plaintiff was moderately impaired in three areas of mental work abilities: (1) her ability to relate to others, including fellow workers and supervisors; (2) her ability to understand, remember, and follow instructions; and (3) her ability to withstand the stress and pressure associated with day-to-day work activity. (Tr. 295). Dr. Jones thought that Plaintiff was mildly impaired in her ability to maintain attention, concentration, persistence, and pace. *Id.*

In December 2002 a record-reviewing psychologist for the Ohio BDD, Vicki Casterline, Ph.D., completed a form by checking various boxes indicating her opinion that Plaintiff was either moderately limited or not significantly limited in her mental work abilities. (Tr. 311-12). Dr. Casterline did not find Plaintiff markedly limited in any mental work area. *See id*. Dr. Casterline then explained:

> Claimant has been treated for depressive symptoms. She reports that she has heard voices for many years, but old records do not support this. Currently, the possible psychotic symptoms do not result in substantial restriction of functioning. She lives alone, cares for her child, goes to school, and does routine chores. She has borderline intelligence, and receives some assistance with money management and bill paying. She is able to understand and follow simple instructions and make simple decisions. She is able to relate to others in routine work settings, but would have some difficulty tolerating jobs which require close interactions with others. She is able to tolerate changes in a work setting, but would have difficulty with frequent changes of job duties.

(Tr. 313).

In April 2003, Plaintiff began treatment at Samaritan Behavioral Health with Sheryl Beard, M.S., L.P.A. (Tr. 380-85). On initial intake, Plaintiff related a history of childhood sexual and physical abuse. (Tr. 381). She reported hearing a male voice call her name. (Tr. 382). Plaintiff also reported that she had used marijuana every day for 6

to 7 years until 3 weeks before meeting with Ms. Beard. (Tr. 380).

Ms. Beard checked lines on a form thus noting symptoms of depression, hopelessness, helplessness, excessive worrying, isolation, suicidal ideation, mood swings, irritability, anger, and paranoia. (Tr. 383). Ms. Beard diagnosed a major depressive disorder, recurrent, severe, with psychotic feature. (Tr. 385). She also noted that Plaintiff had borderline personality disorder traits, and she assigned a GAF of 40 (Tr. 385) indicating "some impairment in reality testing or communication ... or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work....). DSM-IV-TR at p. 34.

On May 2, 2003, Plaintiff began therapy with Ms. Beard. (Tr. 377).

In May 2003 Plaintiff was seen for a psychiatric evaluation by Susan Songer, M.D. (Tr. 373-75). Plaintiff continued to report symptoms of depression, experience auditory hallucinations, and a history of childhood abuse. (Tr. 373). She noted impulsive behavior such as rages and anger outbursts when frustrated. *Id*.

Dr. Songer diagnosed Plaintiff with Axis I: major depressive disorder, recurrent, severe, with psychotic features and PTSD; Axis II: deferred with strong borderline traits. (Tr. 375). Dr. Songer (similar to Ms. Beard) assessed Plaintiff's GAF at 40-45 and placed Ms. Lawrence on Effexor and Seroquel. (Tr. 373).

For the next few months, Plaintiff continued therapy with Ms. Beard and psychiatric care with Dr. Songer. (Tr. 357-72). In August 2003, Dr. Songer responded to a questionnaire from the Ohio BDD by indicating that Plaintiff had a depressed mood, although her affect had improved with treatment. (Tr. 354-56). Dr. Songer noted that Plaintiff had showed a moderate level of anxiety with worry and irritability and had some mild paranoia and auditory hallucinations. (Tr. 354). Dr. Songer believed that Plaintiff did not have much difficulty following directions and Dr. Songer noted that Plaintiff had reported some difficulty maintaining attention and concentration. (Tr. 355). Dr. Songer

indicated that Plaintiff had difficulty maintaining social relationship and had not adapted well to stress and change. *Id.* And Dr. Songer thought that Plaintiff would not react well to the pressures in a work setting involving simple, repetitive, and routine tasks, and she added that Plaintiff was overwhelmed currently even without working. (Tr. 355).

On October 13, 2003, psychologist Guy Melvin, Ph.D. reviewed Plaintiff's records for the Ohio BDD. (Tr. 318-33). Dr. Melvin found that Plaintiff had a moderate restriction of activities of daily living; moderate difficulties in social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one or two repeated episodes of decompensation. (Tr. 328). Dr. Melvin checked boxes on a form indicating his opinion that Plaintiff had moderate limitations or was not significantly limited in her mental work abilities. (Tr. 331-32). He did not believe that Plaintiff was markedly limited in any areas of her mental work abilities. *See id.* Dr. Melvin explained in part:

> Clmt [Claimant] is able to care for her two children and is currently pregnant. She needs some assistance with managing her finances due to her limited reading skills. She enjoys watching movies. Claimant has the capacity to attend to SRRTs [simple, repetitive, routine tasks] for reasonable periods.
>
> Clmt reports socializing on a daily basis. Her reports of social withdrawal are inconsistent with her reported social activity. She worked as a cashier in the past. She would likely perform better in a work setting with more limited contact with the public.
>
> Clmt has a long [history] of depression and anxiety as well as limited cognitive function. She is receiving Rx and therapy. She had one pysch IP [presumably, inpatient hospitalization] in 2002, but none since. She was laid off from past job. She is able to care for two children and is pregnant with her third. She appears capable of adapting to a work setting with SRRTs, no production quotas or requirement for fast pace and limited interpersonal demands.

(Tr. 333). A second psychologist affirmed these opinions in February 2004 without providing any supporting explanation. (Tr. 3233, 386).

Plaintiff continued treatment with Ms. Beard and Dr. Songer. (Tr. 342-45). In January 2004, Dr. Songer again responded to a questionnaire from the State agency. (Tr. 339-41). Dr. Songer noted that Plaintiff continued to be depressed and was usually tearful; her affect was restricted; she continued to have intrusive thoughts related to her PTSD, as well as auditory hallucinations. Dr. Songer also noted that Plaintiff's and judgment was fair to poor, with a history of impulsivity. (Tr. 339). Dr. Songer continued the same diagnoses and indicated that she was in the process of changing Plaintiff's anti-psychotic medications. (Tr. 340). Dr. Songer noted that Plaintiff had demonstrated some problems remembering directions between sessions; she could maintain attention in sessions but had trouble sustaining concentration for extended periods. Dr. Songer noted that Ms. Lawrence was "fairly isolated [and] somewhat paranoid of others' intentions" and showed problems adapting to changes. *Id*. Dr. Songer continued to note that Ms. Lawrence would not react well to the pressures of even simple and routine tasks due to being overwhelmed by day-to-day living. *Id.*

In December 2005 Plaintiff was seen for a consultative psychological evaluation by Katherine A. Myers, Psy.D., at the request of the Ohio BDD. (Tr. 388-96). Plaintiff related much of the same history as in previous evaluations. *See* Tr. 388-89.

Dr. Myers noted that Plaintiff was frequently tearful in the interview. Her mood appeared depressed. She described feeling frustrated and irritable with a poor appetite and disturbed sleep. She still had thoughts of suicide but her kids keep her from acting on the thoughts. Plaintiff reported that she had nightmares and flashbacks about her abuse. (Tr. 390). She also reported that she heard noises and voices, "which at times tell her to kill or harm herself." (Tr. 391). And she noted that the voices distracted and confused her. *Id*.

Dr. Myers diagnosed Axis I: major depressive disorder, recurrent, severe, with psychotic features; posttraumatic stress disorder; and learning disorder; and Axis II: borderline personality traits. (Tr. 392). Dr. Meyers assessed Plaintiff's GAF at 45.

According to Dr. Myers, Plaintiff's symptoms of depression and anxiety caused her to be moderately to markedly limited in her ability to relate to others. (Tr. 392). She further opined that Plaintiff's ability to understand, remember, and follow instructions was mildly impaired; her ability to maintain attention, concentration, persistence and pace to perform routine tasks was moderately impaired; and her "mental ability to withstand the stress and pressures associated with day-to-day work activity" was moderately to markedly impaired. (Tr. 392-93). On the last point, Dr. Meyers noted that Plaintiff appeared significantly depressed and easily irritated. (Tr. 393).

During the ALJ's hearing, psychologist Mary E. Buban, Ph.D. testified in detail about her review of the record. (Tr. 708-19). Dr. Buban opined that Plaintiff was limited to simple tasks with no high production quotas. (Tr. 718). She further opined that looking at the psychological/psychiatric problems, Plaintiff did not meet or equal the criteria in the Commissioner's Listings. (Tr. 718-19; *see infra*, III). She explained, "I don't see any extended hospitalizations. I don't see periods of deterioration. I don't see any concerns in their treatment record about her ability to care for the children or live independently. The treatment records have encourage vocational rehabilitation, obtaining the GED, and obtaining work." (Tr. 718-19).

## III.    ADMINISTRATIVE REVIEW

### A.    <u>"Disability" Defined and the Sequential Evaluation</u>

The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70 (1986). A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a

disability.  *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence.  *See* Tr. 23-31; *see also* 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).[5]  Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the evaluation answers five questions:

1.      Has the claimant engaged in substantial gainful activity?

2.      Does the claimant suffer from one or more severe impairments?

3.      Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?

4.      Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.      Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

**B.      The ALJ's Decision**

ALJ Padilla conducted required five-step sequential evaluation, concluding as follows:

Step 1:      Plaintiff had not engaged in any substantial gainful activities since during any relevant time.

_____

[5]  The remaining citations will identify the pertinent SSI Regulations with full knowledge of the corresponding DIB Regulations.

Step 2:       Plaintiff suffered from the severe impairment of possible borderline
              intellectual functioning; illiteracy; history of marijuana abuse; affective
              disorder; and anxiety disorder.

Step 3:       Plaintiff did not have an impairment or combination of impairment that met
              or equaled the criteria of the Listings.

Step 4:       The ALJ assessed Plaintiff's Residual Functional Capacity as follows:

              After careful consideration of the entire record, the undersigned finds
              that the claimant has the residual functional capacity to perform work at all
              levels of exertion with the following nonexertional restrictions: unskilled,
              simple, repetitive tasks; no reading requirements; no extended periods of
              concentration; no above average production quotas; and low stress jobs that
              are not fast paced.

Step 4:       Plaintiff could not perform her past relevant work.

Step 5:       Plaintiff could perform a significant number of jobs existing in the national
              economy.

As a result of the ALJ's findings throughout the sequential evaluation, he concluded that Plaintiff was not under a disability and not eligible for DIB or SSI. (Tr. 18-33).

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's decision determines whether substantial evidence in the administrative record supports the ALJ's factual findings. *Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6ᵗʰ Cir. 2007). "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)). It consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6ᵗʰ Cir. 2007). Judicial review for substantial evidence is deferential not *de novo*. *See Cruse v. Commissioner of Social Sec*. 502 F.3d 532, 540 (6ᵗʰ Cir. 2007); *see also Cutlip v.*

*Secretary of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). The Court's agreement or disagreement with the ALJ's findings plays no role in the substantial evidence review, and no significance attaches to contrary evidence in the record – if other substantial evidence supports the ALJ's findings. *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).

Reviewing for substantial supporting evidence is not the stopping point of judicial analysis. Courts also examine the administrative decision to determine whether the ALJ applied the correct legal criteria. *See Bowen*, 478 F.3d at 746. If the ALJ did not, the decision may not be upheld even when substantial evidence supports the ALJ's findings. *See id.* For example, a decision will not be upheld where the ALJ failed to apply the standards mandated by the Social Security Regulations and where that failure prejudices a claimant on the merits or deprives the claimant of a substantial right. *See Bowen*, 478 F.3d at 746 (and cases cited therein). Through *Bowen* and other recent Sixth Circuit cases, an ALJ's failure to apply the correct legal criteria – at least when evaluating medical source opinions – mandates further judicial review for harmless error. *Bass II v. McMahon*, 499 F.3d 506, 512 (6th Cir. 2007); *see Bowen*, 478 F.3d at 747-49; *see also Wilson*, 378 F.3d at 547-49 (offering examples of possible *de minimis* errors). Consequently, if the ALJ erred by not applying the correct legal criteria but the error was harmless, the decision should be affirmed. *See Bass II*, 499 F.3d at 512 (and cases cited therein).

## V.     DISCUSSION

### A.      The Parties' Contentions

Plaintiff contends, "The administrative law judge's finding of residual functional capacity is not supported by substantial evidence as a matter of law since the administrative law judge erred his assessment of medical source opinions." (Doc. #9 at 12).

The ALJ erred, according to Plaintiff, by rejecting her treating psychiatrist Dr.

Songer's opinions by not evaluating them with the legal criteria applicable to determining whether the opinions deserved controlling weight. Plaintiff also argues that the ALJ did not continue to weigh Dr. Songer's opinions under any of the regulatory factors, thus leaving his decision without good reasons for rejecting this treating source's opinions.

Plaintiff also contends that the ALJ rejected the opinions of two examining medical sources, Dr. Jones and Dr. Meyers, with little analysis. And Plaintiff maintains that the ALJ likewise failed to apply any regulatory factor when crediting the opinions provided by Dr. Buban. Plaintiff lastly argues that the ALJ provided no analysis of the opinion of treating therapist, Ms. Beard.

The Commissioner argues that the ALJ's assessment of Plaintiff's Residual Functional Capacity "is supported by the limitations of record." (Doc. #11 at 13). The Commissioner reasons:

> Here, the ALJ correctly set out the limitations found by Drs. Songer, and Myers and included those limitations in a hypothetical question that the ALJ posed to the vocational expert. When the vocational expert responded to that question by identifying jobs that [Plaintiff] could perform, the ALJ had substantial evidence to support a finding of 'not disabled.'

(Doc. #11 at 13). The Commissioner further contends that the consultative examinations by Drs. Jones and Myers support, in the main, the limitations set by the ALJ.

The Commissioner maintains that the ALJ did not ignore Ms. Beard; rather, he "did not see much point in discussing reports from a counselor who saw [Plaintiff] on a sporadic basis, which the ALJ discussed." *Id.* at 19. And, according to the Commissioner, the ALJ did not ignore the pertinent statements from Ms. Beard, especially her statement that Plaintiff once said she was returning to treatment because her lawyer told her it would help her get SSI. *Id.*

**B.    Medical Source Opinions**

**1.**
**Treating Medical Sources**

13

Key among the standards to which an ALJ must adhere is the principle that greater deference is generally given to the opinions of treating medical sources than to the opinions of a non-treating medical source. *Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 242 (6ᵗʰ Cir. 2007); *see* 20 C.F.R. §404.1527(d)(2). This is so, the Regulations explain, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a DIB claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examiners, such as consultative examinations or brief hospitalizations...." 20 C.F.R. §404.1527(d)(2); *see also Rogers*, 486 F.3d at 242. In light of this, an ALJ must apply controlling weight to a treating source's opinion when it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. *Rogers*, 486 F.3d at 242; *see Wilson v. Commissioner of Social Sec.*, 378 F.3d 541, 544 (6ᵗʰ Cir. 2004); *see also* §404.1527(d)(2).

If either of these attributes is missing, the treating source's opinion is not deferentially due controlling weight, *Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.3d at 544, but the ALJ's analysis does not end. Instead, the Regulations create a further mandatory task for the ALJ:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable [data] ... or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected.....

Social Security Ruling 96-2p, 1996 WL 374188 at *4. The Regulations require the ALJ to continuing the evaluation of the treating source's opinions by considering "a host of other factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242;

*see Wilson*, 378 F.2d at 544.

"[I]n all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician [or psychologist] is entitled to great deference, its non-controlling status notwithstanding." *Rogers*, 486 F.3d at 242.

**2.**
**Non-Treating Medical Sources**

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p, 1996 WL 374180 at *2. Yet the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source. *See id.* at *2-*3. The Regulations explain, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. §404.1527(b). To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in §404.1527(d) including, at a minium, the factors of supportability, consistency, and specialization. *See* 20 C.F.R. §404.1572(f); *see also* Ruling 96-6p at *2-*3.


**C.**     **Analysis**

The ALJ began his discussion of Plaintiff's Residual Functional Capacity by stating, in part, that he "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSR [Social Security Rulings] 96-2p, 96-5p and 96-6p." (Tr. 27). The ALJ did not separately describe the legal criteria set forth in these Regulations and discussed in these Rulings. The Court must therefore scrutinize the ALJ's decision to determine whether he applied the correct legal criteria when evaluating the medical source opinions. *See Bowen*, 478 F.3d at 746.

It is helpful at the outset of this task to recall that the ALJ found Plaintiff's mental

work ability was limited to work consisting of "unskilled, simple, repetitive tasks; no reading requirements; no extended periods of concentration; no above average production quotas; and low stress jobs that are not fast paced." (Tr.

Plaintiff's treating psychiatrist Dr. Songer found greater restrictions on Plaintiff's mental work abilities than the ALJ found. Dr. Songer, for instance, noted in August 2003 that Plaintiff had difficulty maintaining social relationship and had not adapted well to stress and change. (Tr. 355). Dr. Songer thought that Plaintiff would react well to the pressures in a work setting involving simple, repetitive and routine tasks. But Dr. Songer noted that Plaintiff was overwhelmed currently even without working. (Tr. 355).

In January 2004, Dr. Songer noted that Plaintiff's insight and judgment was fair to poor; she was "fairly isolated [and] somewhat paranoid of others' intentions" and showed problems adapting to changes. (Tr. 340). Dr. Songer continued to note that Plaintiff would not react well to the pressures of even simple and routine tasks due to being overwhelmed by day-to-day living. *Id.*

The ALJ's decision does not indicate that he applied the legal criteria mandated by the Regulations to consider whether Dr. Songer's opinions were due controlling weight under 20 C.F.R. §404.1527(d)(2), and if not, to further consider whether her opinions were due any weight under the remaining factors mandated by the Regulations. This constituted error. *See Rogers*, 486 F.3d at 242; *see also Wilson*., 378 F.3d at 544. The ALJ's failure, moreover, conflicts with the reason-giving requirement explicitly mandated by the Commissioner's Regulations. 20 C.F.R. §404.1527(d)(2); *see also Wilson*, 378 F.3d at 544-45. "[T]he ALJ must provide 'good reasons' for discounting treating physicians' opinions, reasons that are sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242.

Rather than applying the required regulatory factors, the ALJ rejected the opinion of Dr. Songer because he felt that Dr. Songer believed Plaintiff was "overwhelmed by

situational factors such as repeated pregnancies, a very rocky relationship with her boyfriend, poor academic background with illiteracy, and lack of support system." (Tr. 28). This is not a reasonable reading of Dr. Songer's opinions and records. Dr. Songer certainly noted that Plaintiff had problems in these areas, but she did not attribute Plaintiff's limitations on her situational problems. For example, Dr. Songer's January 2004 report to the Ohio BDD explained that Plaintiff suffers from posttraumatic stress disorder including intrusive thoughts and avoidance behavior; she has depressed mood and was usually tearful; her affect was in the restricted to dysphoric range; she felt paranoid often; she had problems concentrating for extended periods; she had a history of impulsivity and self-mutilating behavior; and she had a major depressive disorder, recurrent, severe with psychotic features. (Tr. 340). Contrary to the ALJ's finding, Dr. Songer did not simply see that Plaintiff was incapable of simple and repetitive work because she was overwhelmed as a single mother, but rather, Dr. Songer saw the fact that Plaintiff had difficulty coping with every day life as evidence that she would be unable to handle the stress and pressure of work. (Tr. 355). The ALJ, moreover, did not support his contrary "situational" finding by reference to any medical opinion or other evidence. This leaves his finding without substantial supporting evidence. *Se*e Social Security Ruling 86-8 ("Reasonable inferences may be drawn, but presumptions, speculations and suppositions should not be substituted for evidence."); *cf. White v. Commissioner of Social Sec.*, __ F.3d __, __, 2009 WL 2003583 at *11 (July 13, 2009)(criticizing the ALJ's finding that the plaintiff's depression was "situational" by noting, "A person's personal problems and his or her mental disorders cannot always be so neatly disentangled.").

        The ALJ also emphasized, as does the Commissioner, that Plaintiff missed multiple appointments. In this manner, the ALJ equates the gaps in treatment either to improvement in Plaintiff's symptoms or to the non-restricting impact these impairments have on her work life, without relying on substantial supporting evidence. "ALJs must be

careful not to assume that a patient's failure to receive mental-health treatment evinces a tranquil mental state. For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself." *White*, __F.3d at __, 2009 WL 2003583 at *10 (citing *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009)); *see Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989)("it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation). This is particularly so in the present case where the record often indicates that Plaintiff had poor insight and judgment. *See, e.g.,* Tr. 340.

The ALJ also erred by not applying the correct legal criteria to the largely consistent reports of two consulting examining psychologists, Drs. Jones and Myers, and further erred by crediting the opinions of record-reviewing psychologist, Dr. Buban, without applying any regulatory factor or stating a reason for crediting her opinion. This was contrary to the Regulations, which require ALJs to evaluate such opinions at least under the factors of supportability, consistency, and specialization. *See* 20 C.F.R. §404.1427(f)(ii), (iii). The Regulations seem to emphasize the significance of this requirement by reiterating it no less than three times. *See* 20 C.F.R. §404.1527(d) ("we consider all of the following factors in deciding the weight to give any medical opinion...."); *see* also 20 C.F.R. §404.1527(f)(ii) (factors apply to opinions of state agency consultants); 20 C.F.R. §404.1527(f)(iii) (same as to medical experts' opinions); Social Security Ruling 96-6p, 1996 WL 374180 at *2 (same).

The Commissioner's contentions do not directly address the above errors. *See* Doc. #11 at 13-20. The Commissioner instead focuses on the hypothetical questions as a means of demonstrating that the limitations identified by the ALJ were largely consistent with the medical sources' opinions. If so, the Commissioner would effectively show harmless error in the ALJ's failure to apply the correct legal criteria to the medical source opinions because the vocational expert's testimony, based on those limitations, would support the ALJ's ultimate non-disability finding.

The Commissioner's contentions lack merit because the ALJ did not include a limitation regarding Plaintiff's ability to relate to others. This was contrary to the opinions of both Dr. Myers, who found Plaintiff moderately to markedly limited in her ability to relate to others (Tr. 392) and Dr. Jones, who noted, "it is questionable whether she would be able to relate to co-workers and supervisors – for any sustained period of time – in order to complete simple repetitive tasks...." (Tr. 294). Consequently, the ALJ's errors in failing to evaluate the opinions of these medical sources under the legal criteria required by the Regulations was not harmless since their opinions, if credited, would require the inclusion of these limitations in the hypothetical questions to the vocational expert. Their absence from the hypotheticals, *see* Tr. 724, defeats the Commissioner's reliance on the vocational expert's testimony.

Accordingly, Plaintiff's Statement of Errors lacks merit.

### D.  <u>Remand Is Warranted</u>

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under Sentence Four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and because the evidence of a disability is not strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176.

Plaintiff, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of §405(g) due to problems set forth

above. On remand, the ALJ should be directed to (1) re-evaluate the medical source opinions of record under the legal criteria applicable under the Commissioner's Regulation and Rulings and as mandated by case law; and (2) review Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and thus eligible for DIB.

Accordingly, the case should be remanded to the Commissioner and the ALJ for further proceedings consistent with this Report and Recommendations.

## IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's non-disability finding be vacated;

2.      No finding be made as to whether Plaintiff Rosalind Lawrence was under a "disability" within the meaning of the Social Security Act;

3.      This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. §405(g) for further consideration consistent with this Report; and

4.      The case be terminated on the docket of this Court.

July 22, 2009                                    ___s/Sharon L. Ovington_____
                                                          Sharon L. Ovington
                                                          United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Am,* 474 U.S. 140 (1985).